# EXHIBIT G

```
 1                    UNITED STATES BANKRUPTCY COURT
                       NORTHERN DISTRICT OF OKLAHOMA
 2

 3   --------------------------------X
                                     :  09-80795
 4   In Re:                          :
                                     :
 5     MAHALO ENERGY (USA), INC.,    :  Tulsa, Oklahoma
                                     :
 6                                   :  June 9, 2009
                            Debtor.  :
 7   --------------------------------X

 8           TRANSCRIPT OF TELEPHONIC HEARING REGARDING
              ISSUANCE OF BENCH RULING ON MOTIONS
 9          BEFORE THE HONORABLE TERRENCE L. MICHAEL
               UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:              G. DAVID BRYANT, ESQ.
                                  STEPHEN W. ELLIOTT, ESQ.
13                                Kline, Kline, Elliott &
                                    Bryant, P.C.
14                                720 NE 63rd Street
                                  Oklahoma City, Oklahoma 73105
15
     For Ableco Finance, LLC:     CHAD J. KUTMAS, ESQ.
16                                GARY M. McDONALD, ESQ.
                                  Doerner, Saunders, Daniel &
17                                  Anderson, LLP
                                  320 S. Boston - Suite 500
18                                Tulsa, Oklahoma 74103

19   For the Unsecured           LAURIE D. BABICH, ESQ.
     Creditors Committee:         Baker & McKenzie
20                                2001 Ross Avenue
                                  2300 Trammell Crow Center
21                                Dallas, Texas 75201

22   For Vectra CBM, LLC:         MARK A. CRAIGE, ESQ.
                                  Morrel, Saffa, Craige, P.C.
23                                3501 South Yale Avenue
                                  Tulsa, Oklahoma 74135
24

25                                (Appearance continued on next page.)


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
 1                  UNITED STATES BANKRUPTCY COURT                    2
                    NORTHERN DISTRICT OF OKLAHOMA
 2

 3      APPEARANCES CONTINUED:

 4      For Wells Fargo              JOHN E. HOWLAND, ESQ.
        Foothill, LLC:              Rosenstein, Fist & Ringold
 5                                  525 South Main, Suite 700
                                    Tulsa, Oklahoma 74103
 6

 7      For Savanna Energy           KARALENA ROBERTS, ESQ.
        Services Corp.:             Elias, Books, Brown and
 8                                    Nelson, P.C.
                                    211 N. Robinson - Suite 1300
 9                                  Oklahoma City, Oklahoma 73102

10      For Rose Resources, LLC:     KEVIN P. DOYLE, ESQ.
                                    Pray, Walker, Jackman,
11                                  Williamson & Marlar, P.C.
                                    100 Fifth Street, Suite 900
12                                  Tulsa, Oklahoma 74103

13      For Williams Production      STEVEN W. SOULE, ESQ.
        Mid-Continent, LLC,         JOHN T. RICHER, ESQ.
14      and Penn Virginia MC        Hall, Estill, Hardwick, Gable,
        Operating Company, LLC:     Golden & Nelson, P.C.
15                                  320 S. Boston Avenue, Suite 200
                                    Tulsa, Oklahoma 74103
16
        For Baker Hughes Oilfield    HOLLY HAMM, ESQ.
17      Operations, Inc.:           Snow, Fogel, Spence, LLP
                                    2929 Allen Parkway, Suite 4100
18                                  Houston, Texas 77019

19      For Wells Fargo              LAWRENCE V. GELBER, ESQ.
        Foothill, LLC:              Schulte, Roth & Zabel, LLP
20                                  919 Third Avenue
                                    New York, New York 10022
21
        Special Counsel for          JOSHUA WELLS, ESQ.
22      UCC:

23
                                    (Appearances continue on next page.)
24

25
```

```
 1                  UNITED STATES BANKRUPTCY COURT                3
                   NORTHERN DISTRICT OF OKLAHOMA
 2

 3    APPEARANCES CONTINUED"

 4    For the U.S. Trustee:        KATHERINE VANCE, ESQ.
                                   Office of the U.S. Trustee
 5                                 224 South Boulder - Suite 225
                                   Tulsa, Oklahoma 74103
 6

 7    Court Transcriber:           RUTH ANN HAGER
                                   TypeWrite Word Processing Service
 8                                 211 N. Milton Road
                                   Saratoga Springs, New York  12866
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1  (Proceedings began at 2:01 p.m.)

2          THE COURT:  -- USA, Inc., debtor.  It's a Chapter 11

3  case.  We're here today for the Court to issue its bench ruling

4  on the motion to use cash collateral and the motion regarding

5  the sale procedures.

6          Could I have appearances for the record, please?

7          MR. BRYANT:  Your Honor, for the debtor David Bryant,

8  Steve Elliott, Mark Monson [Ph.].

9          MR. KUTMAS:  For Ableco, Your Honor, Chad Kutmas and

10 Gary McDonald and possibly Paul Moak is on the line.

11         MR. MOAK:  Yes.  Paul Moak is also here.

12         MS. BABICH:  Your Honor, Laurie Babich for the

13 Unsecured Creditors' Committee.

14         MR. CRAIGE:  Your Honor, Mark Craige for Vectra CBM,

15 LLC, and also my client's principals, Paul Heinz [Ph.] and

16 Kevin Herringer [Ph.] are listening in but have been instructed

17 to be silent unless otherwise directed to speak.

18         MR. HOWLAND:  Your Honor, John Howland for Wells

19 Fargo Foothill.

20         MS. ROBERTS:  Your Honor, Karalena [Ph.] Roberts for

21 Savannah Drilling and Trailblazer Drilling.

22         MR. DOYLE:  Kevin Doyle, Rose Resources and my

23 client, Ben Stanley [Ph.] is also listening in.

24         MR. SOULE:  Your Honor, Steve Soule for the Williams

25 entities and also for the Penn Virginia entities, and John

5

1  Richer is also on a different line from mine which may be

2  listening in.  Thank you.

3          MS. HAMM:  Your Honor, Holly Hamm on behalf of Baker

4  Hughes Oilfield [inaudible].

5          MR. GELBER:  Your Honor, Lawrence Gelber of Schulte,

6  Roth & Zabel on behalf of Wells Fargo Foothill.

7          MR. WELLS:  Your Honor, Joshua Wells [Ph.] as special

8  counsel for the UCC [Ph.].

9          THE COURT:  Are there any other appearances?

10 United States Trustee is not on the call?  Just a moment,

11 please.

12          [Pause in the proceedings.]

13          THE COURT:  I apologize for the delay.

14          [Pause in the proceedings.]

15          THE COURT:  Just a moment.  We're waiting on the

16 United States Trustee to join the call.

17          [Pause in the proceedings.]

18          THE COURT:  Has the United States Trustee joined this

19 call?

20          Whoever is speaking, just so you know, the microphone

21 is picking you up perfectly.

22          [Pause in the proceedings.]

23          THE COURT:  We're going to go -- stay on the line

24 everyone but we are going to go off the record for just a

25 second.  Hold on.

6

1                    [Off the record.]

2          THE COURT:  We are back on the record in case number

3    09-80795, Mahalo Energy (USA), Inc.  It is my understanding a

4    party has joined the call.  Is that correct?  If so, would that

5    party please make an appearance?

6          MS. VANCE:  Your Honor, Katherine Vance for the

7    United States Trustee.

8          THE COURT:  Thank you.

9          Counsel, let me start with a little background as to

10   how this process works.  When I issue bench rulings of this

11   nature, what I do is read my findings and conclusions into the

12   record.  Those findings and conclusions are being transcribed

13   as we speak.  An audio compact disk would be available, I

14   believe, yet today at the conclusion of the hearing and parties

15   can order transcripts.

16         Obviously, you are welcome to and I invite you to

17   take notes.  I would advise the parties that I issue rulings

18   using a speaking outline and my speaking outline this afternoon

19   is 27 pages long, so note-taking might become a bit tedious.

20         Presently before the Court are the following motions:

21   The motion to use cash collateral, motion for authority to

22   obtain credit under Section 364(b) and Rule 4001(c), the

23   financing motion filed by the debtor; also are -- before the

24   Court is the motion to assume lease or executory contract under

25   Section 365; motion for sale of property under Section 363(b);

7

1   motion to sell property free and clear of liens of

2   substantially all property of the estate, which in effect I

3   will refer to as the sale procedures motion.  Each of these

4   motions has drawn various and sundry objections.  The

5   evidentiary hearing was held on the motions on June 8, 2002 --

6   2009.  The evidence was received and argument made.

7           The following findings of fact and conclusions of law

8   are made pursuant to Federal Rule of Bankruptcy Procedure 7052,

9   which is made applicable to this contested matter by Federal

10  Rule of Bankruptcy Procedure 9014.

11          The Court makes the following findings regarding its

12  jurisdiction.  The Court finds that is has jurisdiction over

13  this matter pursuant to 28 United States Code Section 1334(b).

14  The Court finds -- further finds that reference to the Court of

15  this bankruptcy case is proper pursuant to 28 United States

16  Code Section 157(a).  The Court finds that the issues raised in

17  the financing motion and the sale procedures motion constitute

18  core proceedings as that term is defined under 28 United States

19  Code Section 157(b)(2)(A)(M) and (N).

20          The Court further finds that this case has been

21  referred to this Court by general order of the United States

22  District Court for the Eastern District of Oklahoma.  On that

23  basis the Court concludes that it has jurisdiction and

24  authority to enter its findings of fact, conclusions of law and

25  judgment.

8

1          The Court makes the following findings of fact.

2   Mahalo Energy (USA) filed an original petition for relief under

3   Chapter 11 of the United States Bankruptcy Code with this court

4   on May 21, 2009, some 19 days ago.  It continues in control of

5   its assets as a debtor-in-possession.  Its primary business is

6   the acquisition of, exploration for, and development and

7   production of coal bed methane and shale gas in Hughes, Le

8   Flore, Okfuskee, McIntosh and Pittsburg Counties in the State

9   of Oklahoma.  The debtor owns interest in approximately 300

10  producing gas wells and leases over 60,000 net acres of coal

11  bed methane and shale gas prospective lands.

12          The debtor is wholly owned by Mahalo Energy, Limited,

13  an Alberta corporation that has presently filed for creditor

14  protection under Canadian law, which was described at the

15  evidentiary hearing as roughly the equivalent of a Chapter 11

16  bankruptcy case in the United States.  Management of the debtor

17  consists of six officers and employees in the country of

18  Canada, as well as staff in Tulsa and field operators.  The

19  staff is well compensated.  Turning to the Canadian staff,

20  there are six employees.  The president and chief executive

21  officer, Mr. Burns [Ph.] who testified in court, is paid

22  $170,000.00 per year in Canadian dollars.  The Chief Operating

23  Officer is paid $185,000.00 per year in Canadian dollars.

24  There are four other Canada employees, two accountants and two

25  engineers who are paid a total of 450 -- and the administrator,

9

1   which I believe I have already included, paid a total of

2   $450,000.00 per year.  Total salary is approximately

3   $805,000.00 per year Canadian or $722,350.00 in U.S. dollars.

4           In Tulsa the debtor employs four accountants and two

5   land men [Ph.] who are paid a total of $490,000.00 per year.

6   There's also a Canadian ex patriate consultant, is how the

7   person was described yesterday, working in the Tulsa office.

8   That person's salary was unclear but when I get to and begin to

9   discuss the budget that person is paid under a separate line

10  item in the budget.  Total administrative compensation for the

11  debtor's professional -- or debtor's employees and officers,

12  not including outside professionals or consultants or field

13  people, totals approximately $1,212,350.00 per year or

14  $101,000.00 per month.

15          Creditors of the debtor include the following:

16  Ableco, which in various of the documents that are at issue

17  today is described as an administrative agent and lender, and

18  Wells Fargo Foothill, LLC, described as a processing agent and

19  lender.  Throughout most of the hearing today I will

20  collectively refer to the credit -- this creditor and the debt

21  as Ableco.  They hold a claim in the approximate amount of 73

22  million dollars and claim a first lien position on virtually

23  all of the debtor's assets.  Ableco is also the proposed lender

24  under the proposed debtor-in-possession financing arrangement.

25          Historically, the evidence before the Court indicates

10

1    that as of June 30, 2008 the debt at issue was 64 million

2    dollars and was owed to Union Bank of California.  That debt

3    was then acquired by Ableco.  Under the terms of the

4    acquisition and subsequent financing the debtor was to meet

5    certain performance or -- criteria or have a sale arrangement

6    of its property by March 31, 2009 or would be assessed an

7    additional fee under the contractual arrangement with Ableco of

8    ten million dollars.  The criteria was not met and the fee was

9    assessed.

10            In addition, the debtor states that it has trade

11    payables of approximately 12.5 million dollars and the debtor

12    also lists a debt to its parent corporation, Mahalo Energy

13    Limited, of 22 million dollars.  The nature of this debt is

14    somewhat unclear.  James Burns, who is both the president of

15    the debtor and of Mahalo Energy Limited, testified that this is

16    inner-company debt and is in the nature of an unsecured claim.

17    However, he did admit that no lone documentation exists with

18    respect to this debt.

19            There are also secured creditors under various joint

20    operating agreements.  Pursuant thereto, entities such as

21    Williams Production Mid-Continent Company operate natural gas

22    wells in which the debtor has a working interest.  The working

23    interest owner such as the debtor is required to pay its

24    proportionate share of costs, expenses and joint interest

25    billings to entities such as Williams as the operator.

11

1  Creditors such as these have filed liens securing their claims.

2  They have pled the same in their objections and they will be

3  considered secured creditors for the purposes of this ruling.

4        Now turn to a brief discussion of the prepetition

5  financial history of the debtor.  Prior to October of 2008 the

6  debtor engaged in an aggressive drilling program for gas based

7  upon expectations that prices for the commodity would remain

8  strong or grow stronger.  The economy did not perform as hoped

9  for and the debtor defaulted upon its various loan obligations

10 to Ableco.  In November of 2008 Ableco began sweeping the

11 accounts of debtor at the Union Bank of California and applying

12 all swept funds to its indebtedness.  Swept funds may have

13 included funds held by debtor in trust for others.  Under its

14 working arrangement with Ableco the debtor would make requests

15 for -- of Ableco for draws in order to pay expenses.  Ableco

16 would then decide how much to advance to the debtor in its sole

17 discretion.

18        Prior to the filing of the bankruptcy case the debtor

19 repay -- retained GMP Securities, LP, where I will refer to

20 "GMP", as an advisor to sell its assets as a going concern.

21 The sale of the business was advertised.  The data room was set

22 up in order to allow prospective buyers to con -- conduct due

23 diligence.  Solicitations were sent to approximately 220

24 prospective buyers.  GMP spoke to 140 of them.  Thirteen of

25 them signed confidentiality agreements in order to obtain

12

1   access to the information contained in the data room.  Twelve

2   looked at the data and five made bids or sale proposals as a

3   result of this process.  Three of those were cash bids in the

4   range of 45 million dollars.  One proposed offer required

5   financing that never materialized and the other involved a

6   merger with another insolvent company and was rejected.  As a

7   result no sale took place or other debtor's assets took place

8   prior to the filing of this bankruptcy case.

9        In looking at the value of the debtor's assets at

10  this point in time based upon the record before the Court, any

11  such determination is problematic at best.  The debtor engaged

12  in a concerted effort to sell its assets as a going concern

13  prior to the filing in this case.  That procedure generated a

14  high bid of 45 million dollars.  The evidence before the Court

15  was offer -- the evidence before the Court was offered

16  yesterday to the effect that after that process was concluded

17  or at least outside of that process the debtor received another

18  cash offering in the range of 60 million dollars.  The

19  information about this bid was sketchy and the one thing that

20  was clear is that this bid did not originate from the

21  prepetition sale process.  The Court will consider 60 million

22  dollars as a maximum valuation of debtor's assets for the

23  purposes of today's ruling.

24       Following the filing of the bankruptcy case the

25  debtor in order to continue operations made efforts to obtain

13

1  post-petition financing.  Debtor, through its consultants

2  Alvarez and Marsal, who I will refer to as "A&M," sought

3  debtor-in-possession financing, or DIP financing, from four

4  sources:  D. E. Shaw [Ph.], Fortress, Silverpoint [Ph.] and

5  Natural Gas Partners.  To put it simply, there were no takers.

6  The debtor was unable to obtain any unsecured credit even if it

7  were grant such credit super-priority status.

8          Mr. Dean Swick, the director at A&M that is working

9  directly with the debtor, stating that as a result of his

10 efforts the financing agreement or the proposed financing that

11 will be later discussed was agreed to and negotiated between

12 the debtor and Ableco.  In his experience the financial terms

13 of that financing are favorable within the marketplace.

14 Mr. Swick's testimony led the Court to believe that Mr. Swick

15 was not involved in the negotiation of many of the nonfinancial

16 terms of the proposed financing.  That proposed financing may

17 be described as follows:  It involves not only financing but

18 the use of cash collateral.  The parties to the agreement are

19 Mahalo Energy (USA), our debtor-in-possession, Ableco Finance,

20 LLC, who I have referred to as "Ableco," and Mahalo Energy

21 Limited, the parent company of the debtor.

22          The loan particulars are as follows.  The amount of

23 the loan is two million dollars.  The proposed financing

24 arrangement requires that debtor draw down the entire two

25 million dollars upon approval of the motion.  There's a

14

1  $40,000.00 origination fee.

2         Proceeds of the loan are to be used, among other

3  things, to pay all of Ableco's fees and expenses incurred in

4  connection with the making of the loan.  The term of the loan

5  is brief.  The term is 18 days if a final financing order is

6  not entered, three months after financing -- or after a final

7  financing order is entered, and last prior to that date there

8  is a sale of all assets to the debtor or if there is somewhere

9  in the loan documents an earlier date as may be prescribed in

10  those documents.  For the record, those documents are

11  voluminous.

12         The interest rate under the term of the loan is

13  variable with a floor of either 16 or 16.5 percent.  It is

14  equal -- according to Mr. Swick, it is equal to the rate

15  charged by Ableco in its last traunch of financing provided to

16  the debtor prior to the case filing.

17         The collateral for the DIP loan is all of the

18  debtor's assets.  This lien to be granted is a priming lien and

19  is to be given priority over all prepetition secured claims.

20  In addition, Ableco is to receive a super priority claim

21  superior to all other super priority claims except the United

22  States Trustee fees and a $250,000.00 professional fee carve-

23  out.  This super priority is to trump all claims that may ever

24  arise in this case under Section 726 of the Code, including

25  claims for a Chapter 7 trustee fees and expenses in the event

15

1  of conversion.   No other super priority claims may be granted

2  absent the agreement of the lender.

3           The Court notes that although counsel for Ableco

4  stated at the hearing that the super priority exists only as to

5  the two million-dollar advance, not as to any prepetition debt,

6  the Court having read Section 10(a) of the proposed order finds

7  that the order is a bit unclear in that regard.   It could be

8  argued that it -- that the order as drafted, and I'm talking

9  about the order that was submitted earlier today and I have

10 read that order for the record, arguably grants a super

11 priority administrative expense claim securing all of Ableco's

12 prepetition indebtedness.   I'm simply saying it's unclear in

13 that regard.   I note that that provision is found in page 8 of

14 a 37-page order.

15           The proposed financing also involves the use of cash

16 collateral.   According to the budget offered and received into

17 evidence the cash collateral use is for the period from

18 June 12, 2009 through August 7, 2009, or approximately two

19 months for several of the items in the budget merit discussion.

20 Included in the budget is $422,524.00 to Mahalo Energy Limited

21 for management and overhead services.   This is roughly

22 $211,000.00 per month.   This number is hard squared with the

23 historical cost of the Tulsa and Canadian administrative

24 employees.   The Court notes that none of these corporate

25 officers appear to have taken any reduction in salary since the

16

1  filing of the case.  What makes this number even harder to

2  understand is the fact that, according to the testimony of

3  Mr. Burns, the category management and overhead fee in the

4  budget referred only to the admin -- payment of the salaries of

5  the administrative employees in Canada, which should total

6  significantly less than this amount.  If the Court's

7  calculations and dollar conversion is correct, it should total

8  about $60,200.00 per month.

9       Also included in the budget was $902,500.00 in

10 professional fees.  Those fees are to be paid among others to

11 the debtor's U.S. counsel.  Mr. Burns testified that some of

12 those fees are also to be paid to Canadian counsel.  The

13 identity of those counsel, the scope of services performed, and

14 how any Canadian counsel fit into this case is presently

15 unknown to the Court.  It involves payment of fees to GMP,

16 payment of fees to counsel for the unsecured Creditors

17 Committee, payment of the statutory fees owed to the United

18 States Trustee, and counsel fees owed to Ableco.  The budget

19 also calls for $104,000.00 to be paid in retention bonuses,

20 which according to Mr. Burns are necessary for Mahalo -- for

21 the debtor to retain key personnel.

22      The budget provides for payment of $28,307.00 in

23 severance pay.  According to Mr. Burns this is simply an effort

24 by the debtor to, and I quote, "Do the right thing" as

25 employees are let go.  Mr. Burns admits there is no contractual

17

1    obligation of the debtor to make such payments.

2          The budget contains a provision for $95,607.00 in

3    other expenses.  None of these expenses was explained or

4    justified in any significant detail beyond the statement of Mr.

5    Burns as current management of the debtor that they are

6    necessary.  In addition, the budget provides for adequate

7    protection payments, payment of post-petition interest on the

8    prepetition claims of Ableco totaling $1,764,451.00 between now

9    and August 7, 2009.  According to Mr. Swick, the debtor agreed

10   to pay this post-petition interest because Ableco demanded it

11   and the debtor had no other financing options.  According to

12   Mr. Swick, were debtor not to pay these sums the debtor's cash

13   flow would allow it to operate without borrowing until at least

14   July 3, 2009 using cash collateral.

15         The Court notes that with respect to this

16   payment of -- this $1,764,000.00 payment, the initial proposed

17   financing order expressly described those payments as payments

18   of post-petition interest on prepetition debt.  So the record

19   is clear, let me state that at the time the financing motion

20   was originally filed submitted to the Court was a proposed

21   interim order, which has not been entered but it was submitted

22   to the Court for review.  Earlier today a proposed final order

23   and a redline copy of the order showing the changes between the

24   two was submitted to the Court.  Parenthetically, I would like

25   to express my appreciation to the parties for submission of the

18

1   redline copies.  That greatly assisted the Court and I am

2   grateful.

3           The order entered today reflects the statements made

4   by counsel for Ableco at yesterday's hearing that the issue of

5   whether the entitlement to post-petition interest on a

6   prepetition debt need not be addressed by the Court, that

7   instead the Court could treat the payments as partial payment

8   of Ableco's petition claim -- prepetition claim and determine

9   later whether the sum should be applied to principal or

10  interest.  In addition, there was other adequate protection

11  offered for the use of cash collateral.  The placement liens

12  and all collateral equal -- in an amount equal to the

13  diminution and value of the collateral and yet another super-

14  priority claim.  The Court also notes and I admitted -- I

15  apologize, I omitted this earlier, but the budget also provides

16  for $55,000.00 to be paid in post-petition interest charges

17  under the DIP financing.

18          There has been no offer of adequate protection made

19  to any other party that may have an interest in any property of

20  the debtor.  Other creditors have claimed to have a first lien

21  on certain of the debtor's assets.  Those creditors include:

22  Williams Production Mid-Continent Company, who I will hereafter

23  refer to as "Williams"; Baker Hughes Oilfield Operations,

24  Incorporated, "Baker Hughes"; Savanna Energy Services

25  Corporation and Trailblazer Drilling Corporation, "Savanna";

19

1   and Penn Virginia Oil and Gas Corporation, "Penn." The nature,

2   extent and priority of those liens has not been determined --

3   pardon me -- given the expedited nature of these hearings.  No

4   one has disputed their existence or at least their potential

5   existence for the purposes of these hearings and the Court will

6   presume that such a security interest exists for the purposes

7   of today's ruling.  Such presumption is only for the purpose of

8   this ruling and the nature, extent and priority of those liens

9   is expressly subject to future determination if necessary.

10          There are other provisions in the proposed financing

11  order that merit mentioning at this point.  Under the terms of

12  the proposed agreement and order the debtor waives the right to

13  seek use of cash collateral or post-petition lending on any

14  other terms or from any other entity.  The debtor, and I quote,

15  "broadly indemnifies each lender, their agents and each of

16  their affiliates, partners, directors, officers, employees,

17  agents and advisors."

18          The waiver of the right to use cash collateral or

19  obtain post-petition financing effectively precludes any route

20  for this case other than the proposed sale of assets.  In the

21  event of default Ableco is authorized to enter into any leased

22  premises to receive its collateral without notice to any

23  landlord and regardless of the contractual relationship between

24  the debtor as lessee and any such landlord as lessor.  None of

25  Ableco's collateral may ever be surcharged for any reason under

20

1   Section 506(c) of the Bankruptcy Code.  Under the terms of the

2   proposed financing debtor, and I quote:  "hereby forever waives

3   and releases any and all claims as defined in the Bankruptcy

4   Code, counterclaims, causes of actions, defenses or setoff

5   rights against the prepetition agent and the prepetition

6   lenders," which are Ableco and Wells Fargo, whether arising at

7   law or in equity, including the recharacterization,

8   subordination, avoidance or other claim arising under or

9   pursuant to Section 105 or Chapter 5 of the Bankruptcy Code or

10  under any other similar provisions of applicable state or

11  federal law."  That's found in Sect -- or paragraph 11(i) at

12  page 14 of the proposed financing order.

13          Provision is -- this provision is especially

14  troubling given the allegations that some of the funds

15  collected by Ableco and applied to its indebtedness may have

16  been held in trust by the debtor for its operators or those

17  entitled to royalties.  The proposed order gives all other

18  parties in the case 45 days from the petition date to review

19  and object to the prepetition claims of the lender, post-

20  petition claims of the post-petition lenders or forever hold

21  their peace.  Moreover, if no objection is timely filed, all

22  parties are bound by the stipulations of the debtor regarding

23  the validity of those creditors' positions.  That provision is

24  binding upon any Chapter 7 trustee subsequently appointed in

25  this case in the event the case were to be converted.

1          Upon the occurrence of the event of default the

2   automatic stay is lifted, the right to use cash collateral is

3   terminated and the lender can immediately enforce all remedies

4   including the rights of setoff.  Upon the issuance of a final

5   order approving the financing arrangement, Ableco has a lien

6   upon all Chapter 5 claims the debtor may have against any

7   parties to secure both pre- and post-petition indebtedness.

8   This financing arrangement may be modified by the debtor and

9   the letter -- lender without court approval upon five days'

10  notice to the unsecured Creditors' Committee and the United

11  States Trustee.  While the debtor agrees to pay all of Ableco's

12  expenses incurred as a result of the post-petition financing

13  from estate funds, none of the expenses are subject to review

14  by any party or the Court.  The Court also notes that, at least

15  under the terms of the proposed financing order, the entire

16  financing arrangement is off if the financing order is not

17  entered within 18 days of the date of the filing of the

18  petition.  Obviously that date has come and gone.

19          Under the terms of the pre -- the order of the Court

20  is -- this Court is to retain jurisdiction in order to enforce

21  the security interest granted to Ableco under the debtor-in-

22  possession loan.  I note parenthetically, this may just be

23  selfish on my part, but in this Court's opinion the Bankruptcy

24  Court is not a place to file foreclosures or replevins or suits

25  on notes.  Those belong in state court or, if diversity exists,

22

1    perhaps in federal district court but so the parties know, as

2    they proceed the Court would not agree to the entry of such a

3    provision.

4           Let us now turn to the sales procedure motion.  On

5    May 21, 2009, the petition date, the debtor entered an asset

6    purchase agreement, which I will refer to as the "CME

7    agreement" or "stalking horse agreement" with an affiliate of

8    Ableco called CME Asset Holdings, which I will refer to as

9    "CME" or the "stalking horse."  Under the terms of the CME

10   agreement, CME agrees to buy all of the debtor's assets.  The

11   terms of the sale are that (1) CME will be allowed to credit

12   bid the debt owed to Ableco.  That bid is to be in the amount I

13   believe of 63 million dollars.  My belief as to that number is

14   based upon testimony of the June 8, 2009 hearing.  The sale

15   agreement is a bit cryptic as to the amount of the bid.

16          In addition to the credit bid, there is to be a cash

17   payment of $350,000.00 and CME will pay an amount required

18   under Section 365(b)(1) of the United States Bankruptcy Code to

19   assume the executory contracts and unexpired leases to be

20   assigned to CME subject to limitations on the cure cost in the

21   agreement and CME reserves the right to reject any contracts or

22   releases.  The sale is subject to higher and better offers

23   under the bidding procedures that have been proposed.

24          What is being sought today is not approval of that

25   sale but approval of a bidding procedure process, specifically

23

1   the relief requested is as follows:  The authorizing and

2   scheduling of an auction at which the debtor will solicit

3   higher and better offers in connection with the sale of

4   substantially all set -- assets of the estate; the

5   establishment of a bid deadline; scheduling of an auction to

6   occur within approximately 30 days after entry of the bidding

7   procedures order; approving the bidding procedures for such

8   assets; approving the form and scope of the notice of the

9   bidding procedures at auction, and I note parenthetically that

10  ori -- at least originally the bidding procedures order under

11  the terms of the parties' agreement had to be entered on or

12  before 18 days after the petition date, and again that date has

13  come and gone.  Under the terms of the agreement the debtor

14  reserves the right to modify the bid procedures as set forth in

15  the order without further notice to the Court or the Court's

16  approval.  I direct the parties to the bidding procedures found

17  at Docket 23-1 at page 17.

18          The Court has asked to schedule a sale hearing in

19  order to approve the sale to the winning bidder.  The Court has

20  asked to waive any ten-day stay of the order authorizing sale

21  as provided in Federal Rule of Bankruptcy Procedure 6004(h).

22  After conclusion of the sale the Court has asked to approve the

23  sale of the assets free and clear of all liens, claims and

24  encumbrances which is allowed under Section 363(f) of the Code

25  if effective lien holders consent.  The debtor asks the Court

24

1   to treat any failure to object as the equivalent of consent to

2   the sale.  Debtor asks that the Court protect the purchaser as

3   a good faith purchaser under Section 363(m) of the Code,

4   including the stalking horse bidder.  The effect of this would

5   be that reverse rule or modification on appeal could not effect

6   the validity of the sale.  As I noted, the debtor wants the

7   stalking horse to be clare -- to be declared a good-faith

8   purchaser by the Court before the fact of any appeal or

9   modification.  The motion states that the arm's-length nature

10  of the transaction will be demonstrated at the sale.

11          The debtor wants the procedure for assumption in

12  executory contracts and leases as set forth in the sale

13  agreement approved, the form and scope of notice of assumption

14  and assignment approved, and with respect to the assumption and

15  assignment the waiver of any ten-day stay of an order

16  authorizing the assignment as provided in Rule 6000(d).

17          The debtor seeks approval of a $10,000.00 breakup fee

18  to the stalking horse bidder in the event there is a higher

19  bidder and also seeks approval of the expenses incurred by the

20  stalking horse bidder.  Those expenses are to be approved

21  without Court review and to the extent they are for any reason

22  unpaid they are to -- all of the breakup fee and the expenses

23  are entitled to administrative priority under Sections 4.5 and

24  7.2 on the stalking horse agreement.  Those are my basic

25  findings of fact.

25

1          As I am sure the parties can appreciate in a bench

2     ruling of this nature, it is possible if not likely that

3     additional findings of fact will inadvertently be misplaced in

4     my conclusions of law.  Any such misplaced findings of fact are

5     incorporated into the Court's findings of fact by this

6     reference.   As the Court reviews both the financing motion and

7     the sales procedure motion, it finds the following statements

8     of Judge Marlar of the United States Bankruptcy Court for the

9     District of Arizona applicable to the facts of this case and I

10    quote:

11         "Debtors in possession generally enjoy little negotiating

12         power with the proposed lender, particularly when the

13         lender has a prepetition lien on cash collateral and other

14         assets.  As a result, lenders often exact terms that are

15         favorable to them but that harm the estate and all other

16         creditors."

17    Judge Mahler cites two cases, In the Matter of:  Ames [Ph.]

18    Department Stores, Inc., 115 Bankruptcy Reporter, page 34 at

19    page 38, a 1990 decision of the United States Bankruptcy Court

20    for the Southern District of New York; in a case entitled In

21    Re: Tenney, T-E-N-N-E-Y, Village Company, 104 Bankruptcy

22    Reporter 562 at pages 567-570, a 1989 decision of the United

23    States Bankruptcy Court for the District of New Hampshire.

24         Judge Marlar goes on to state and I continue the

25    quote:

26

1        "While certain favorable financing terms may be permitted

2        as a reasonable exercise of the debtor's business

3        judgment, Bankruptcy Courts do not allow terms in

4        financing arrangements which convert the bankruptcy

5        process from one design to benefit all creditors to one

6        design for the unwarranted benefit of a post-petition

7        lender."

8   Citing the same cases again.

9        "Thus, Courts look to whether the proposed terms would

10       prejudice the powers and rights that the Code confers for

11       the benefit of all creditors, thereby leveraging the

12       Chapter 11 process by granting a lender excessive control

13       over the debtor or its assets with the prejudice of other

14       parties in interest."

15  Again, citing the Ames and Tenney cases.

16       "The Bankruptcy Court cannot under the guise of Section

17       364 approve financing arrangements that amount to a plan

18       of reorganization but of eight confirmation requirements."

19  Citing a case in the matter entitled In the Matter of Chevy

20  Devco, C-H-E-V-Y, D-E-V-C-O, 78 Bankruptcy Reporter 585 at

21  pages 589 and 590, a 1987 decision of the 19 -- of the United

22  States Bankruptcy Court for the Central District of California.

23          Judge Marlar's decision is found in a case entitled

24  In the Matter of Berry, B-E-R-R-Y, Good, G-O-O-D, LLC, 400

25  Bankruptcy Reporter 741 at page 747, a 2008 decision from the

27

1    Bankruptcy Court for the District of Arizona.  I will hereafter

2    refer to that case as I cite it in the future as the <u>Berry Good</u>

3    case.

4           The financing motion is brought by the debtor under

5    Section 364(d) of the Bankruptcy Code, which provides that and

6    I quote:

7        "The Court after notice in a hearing may authorize the

8        obtaining of credit or the incurring of debt secured by a

9        senior or equal lien on property of the estate that is

10       subject to a lien only if the Trustee is unable to obtain

11       such credit otherwise and there is adequate protection of

12       the interest of the holder of the lien on the property of

13       the estate on which that senior or equal lien is proposed

14       to be granted."

15   Subsection 2 of 364(d) states that:

16       "In any hearing under this subsection the Trustee has the

17       burden of proof on the issue of adequate protection."

18          Financing under Section 364(d) of the Code is

19   commonly known as financing through the use of a priming lien

20   because the lien at issue is given superiority to or primes the

21   liens held by present creditors of the debtor.  Priming is an

22   extraordinary remedy.  Our Court of Appeals has not ruled upon

23   the issue.  Two things, however, are clear.  If a priming lien

24   is to be granted a debtor must provide adequate protection to

25   the liens being primed and the debtor has the burden of proof

28

1   on the issue of adequate protection.  This Court feels that
2   some of the principals that are used in determining whether to
3   authorize credit under Section 364(c) of the Code may be of use
4   here.
5            The United States Bankruptcy Court for the District
6   of Colorado has held that a debtor must prove the following
7   four elements to obtain post-petition financing under that
8   section.  They must establish that the proposed financing is an
9   exercise of sound and reasonable business judgment, that no
10  alternative financing is available on any other basis, that the
11  financing is in the best interest of the estate and its
12  creditors, and that no better offers, bids or timely proposals
13  are before the Court.  Direct the parties to a decision
14  entitled In the Matter of Western Pacific Airlines, Inc., 223
15  Bankruptcy Reporter 567, a 1997 decision of the United States
16  Bankruptcy Court for the District of Colorado.  The Court will
17  consider the teachings of the Western Pacific case, the
18  requirements of adequate protection under 364(d), and the
19  pronouncements of Judge Marlar in Berry Good as it considers
20  whether to approve the financing motion.
21            Looking at this matter the Court is satisfied that
22  the debtor is unable to obtain unsecured credit or credit
23  secured by a junior lien on property of the estate.  The Court
24  is also satisfied, albeit a bit reluctantly, that as to
25  interest rate and the fact that an initial draw of two million

29

1   dollars is required, no better offers of financing are

2   available to the debtor.  The motion, however, becomes

3   problematic when it comes to the requirement of adequate

4   protection.

5           The statute is clear.  In order for a priming lien to

6   be authorized there must be adequate protection of those

7   creditors whose lien is being primed.  Here we have several

8   creditors who claim liens on prop -- several creditors other

9   than Ableco who claim liens on property of the debtor.  While

10  the validity of the liens has not been established through

11  litigation, all of the parties who appeared before the Court

12  and in effect asked the Court to presume that their lien was

13  valid and given the expedited nature of this matter, the Court

14  has chosen to do so.  The Court is certainly not in a position

15  to discard any of the claimed liens as invalid.  With the

16  exception of Ableco, the debtor has chosen to offer no adequate

17  protection to any of the lien holders who are being primed.

18          In closing, counsel -- in closing argument, excuse

19  me, counsel for the debtor suggested that there may be equity

20  in the assets of the debtor that are subject to those

21  creditors' liens.  The Court is not persuaded that the record

22  contains sufficient detail regarding the alleged equity to

23  protect any of those creditors and rejects the argument.  This

24  Court is also not convinced based upon the teachings of <u>Berry</u>

25  <u>Good</u> that the proposed financing is in the best interest of the

30

1  creditors of this estate.¹ The debtor is doing what many a

2  cash-strapped debtor in a Chapter 11 case does, is giving up

3  all of its rights and remedies, indeed even the right to see if

4  any such rights and remedies might exist against its major

5  lender in order to have the cash to live another day.  It is

6  important to remember here that there was not one scintilla of

7  evidence offered by the debtor to the effect that any of the

8  debtor's principals had made any review of the loan

9  documentation between the debtor and Ableco in order to make a

10 determination of the validity of that documentation or that the

11 debtor had no claims against Ableco.

12        There was uncontroverted testimony that debtor -- or

13 that Ableco had taken funds held by the debtor in trust and

14 applied them to its debt.  The Court has no idea whether anyone

15 was ultimately damaged by this and it makes more -- no

16 determination one way or another at this point in time.  It is

17 certainly possible that Ableco re-advanced any wrongfully taken

18 funds to the debtor and that those funds once re-advanced

19 ultimately reached their proper destination.  I have no idea,

20 but the debtor is forfeiting its right to even investigate this

21 and every other issue at the inception of this case.

22        The debtor has taken the position and argued to the

23 Court that the financing motion and the sales procedure motion

24 are to be taken together.  When that is done it seems clear to

25 the Court that sale of the debtor's assets by motion is the

31

1   primary objective of both Ableco and the debtor, that the sale

2   occurs as debtor and Ableco hope.  Regardless of whether the

3   sale is to a third-party cash bidder or to the stalking horse,

4   it is almost certain that this case will not proceed to a plan

5   and disclosure statement for there will be nothing to

6   reorganize.  Indeed, reorganization is not the goal here;

7   proposed sale appears to be a substitute for a plan.

8           It also appears to the Court that the structure of

9   this case in its present posture is likely to benefit no one

10  except Ableco.  Months of prepetition attempts to sell this

11  debtor were fruitless.  The only thing that has changed is that

12  the debtor is now in Chapter 11.  There is no testimony upon

13  which the Court could base a reasonable belief that a white

14  knight stands somewhere on the horizon ready to rescue this

15  debtor and its creditors.

16          The deadlines proposed by Ableco in the financing and

17  sale procedures motions have the effect of forcing this case to

18  operate at light speed.  Parties who have never seen any of the

19  loan documents in this case have 45 days to review those

20  documents and make whatever claims they may have.  The Court

21  notes that the normal statute of limitations for such actions

22  under Chapter 5 of the Bankruptcy Code is two years.

23          Ableco has a *de facto* veto power over any actions

24  taken by the debtor that are not in direct accord with the

25  wishes of Ableco.  It has an absolute right to cancel the

32

1  proposed sale.  If the debtor takes any action outside the

2  prepi -- the prescribed course of sale, Ableco can in effect

3  pull the plug.  Looking at the use of cash collateral, it is

4  inextricably intertwined with the debtor-in-possession

5  financing.  The debtor only seeks to use cash collateral upon

6  the terms set forth in the financing motion.  The Court

7  concludes that several of the terms contained in the cash

8  collateral agreement prejudice the powers and rights of the

9  Code -- that the Code confers for the benefit of all creditors,

10  thereby leveraging the Chapter 11 process by granting a lender

11  excessive control over the debtor or its assets to the

12  prejudice of other parties in interest, quoting Berry Good

13  again, 400 Bankruptcy Reporter at 747.

14           These have all previously been mentioned in a ruling

15  and include the payment of post-petition interest on the

16  prepetition claim.  As a general rule, under-secured creditors

17  are not entitled to pre-confirmation payment of their

18  prepetition claim.  Berry Good, 400 Bankruptcy Reporter at page

19  746.  Nothing in the record is -- there is nothing in the

20  record to support adequate protection payments to Ableco on

21  account of its prepetition claim, no showing that its overall

22  collateral condition would be harmed by the use of cash

23  collateral based upon the budget.  The proposed budget does not

24  illuminate the overall collateral position of Ableco; it simply

25  shows a potential flow of cash.

33

1        Ableco attempts to correct the issue of this payment

2  in its most recent version of the financing order by stating

3  that if it is later determined that Ableco was not entitled to

4  adequate protection, the payments will be treated as payments

5  on their prepetition claim.  This court is aware of no

6  authority that allows a creditor not entitled to adequate

7  protection payments to be paid on its prepetition claim in the

8  absence of a plan, especially while other creditors sit and are

9  paid nothing.  The Court in Berry Good express -- expressly

10 rejected the idea that a post-petition lender could loan money

11 to a debtor for the payment of its prepetition debt.

12        In addition, as previously noted, the proposed

13 financing arrangement including the use of cash collateral

14 requires the debtor to waive its right to seek use of cash

15 collateral or post-petition lending on any other terms or from

16 any other entity, requires the broad indemnification of the

17 lender, the waiver and surrender of all claims against the

18 lender, the broad remedies of default with respect to

19 Able -- granted to Ableco with respect to third parties such as

20 landlords, the inability of any party to even seek a surcharge

21 of Ableco's collateral, the short-term review period of

22 Ableco's claims, the granting of Ableco -- or to Ableco of the

23 lien on all Chapter 5 claims in this case, the ability of the

24 debtor and the lender to modify the financing arrangement

25 without Court approval, payment of Ableco's expenses without

34

1  Court approval, and the items in the budget previously

2  discussed.

3         I'm looking at my notes.  One item I may have missed

4  in the budget that is in the budget that is not a necessary

5  expense is the $100,000.00 item for utility deposits based upon

6  the statements of counsel for the debtor yesterday on that

7  motion.  None of the utilities are requiring a deposit -- a

8  security deposit.  The ruling of the Court is that the

9  financing motion, including the use of cash collateral on the

10  terms proposed therein is not approved.  The ruling is without

11  prejudice to further request for approval of financing and/or

12  the use of cash collateral.

13         Looking at the sales procedure motion, the discussion

14  may be academic given the ruling on the finance motion and

15  statements of debtor's counsel and Ableco's counsel that the

16  finance motion and the sales procedures motion are inextricably

17  intertwined.  It would appear that denial of the finance motion

18  effectively operates as a denial of the sale procedures motion.

19  However, it might be -- further review of that motion may be of

20  assistance to the parties and to any party or court that

21  reviews this court's decision.

22         There are objections to the part -- the objections to

23  the sale procedures motion may be summarized as follows.

24  Baker Hughes objects that the proposed sale does not allocate

25  purchase price among assets and violates Section 363(f) of the

35

1   Code, as the lien claims of Baker are not expressly assumed

2   under the terms of the sale and Baker does not consent to the

3   sale.  Williams and Penn Virginia argue that the proposed sale

4   violates notions of due process, that it is occurring much too

5   quickly, that is is premised on a presumption that Ableco is

6   the first lien holder on every -- of -- with respect to every

7   asset in this case and that the sales procedure does nothing to

8   protect other lien claimants.

9           The United States Trustee has noted that allowing

10  Ableco to credit bid its debt is -- debt is problematic when

11  there are at least nine million dollars and other lien

12  claimants and a potential lien priority issue and argues that

13  any credit bid must provide for some form of cash reserves or

14  procedures to provide for payment of creditors determined to be

15  superior to Ableco.

16          U.S. Trustee objects to the breakup fee, argues that

17  the sale process must provide from input from the parties in

18  interest including the creditors and the Unsecured Creditors

19  Committee.  The U.S. Trustee objects to the bid protections and

20  expense reimbursement proposal as excessive and inappropriate

21  and argues that this court should grant a reasonable extension

22  of the sale process to allow these questions to be addressed.

23          The Court notes that under the terms of the proposed

24  agreement once again the sale of assets less -- rests largely

25  within the discretion of Ableco.  Under their participation

36

1   requirements qualified bidders are defined as those determined

2   to have satisfied the conditions of the bid requirements in the

3   determination of the debtor and its advisors.  Is Ableco an

4   advisor for purposes of this section?  It's unclear.  Under the

5   bid requirements the debtor shall determine whether a bid

6   qualifies as a qualified bid and, again, we have a qualified

7   bidder as one who can provide reasonably satisfactory evidence

8   in the discretion of debtor and its advisors of its financial

9   ability.  The identity of the advisors is not limited to

10  exclude representatives of Ableco or the stalking horse.

11          Both the motion at paragraph 56 in the original

12  proposed order at paragraph 18 conditioned determination of a

13  qualified bidder and qualified bids on the consent of Ableco.

14  That provision was removed in the most recent form of proposed

15  order and assurances were made by counsel for Ableco that that

16  provision never should have been in the original order.

17  Despite those assurances, the Court was and remains at least a

18  bit concerned by the initial presence of these provisions.

19          In the revised sale order the ability of the stalking

20  horse credit bidder -- or excuse me, the ability of the

21  stalking horse bidder to credit bid is and I quote, "Subject to

22  the rights of the Creditors Committee or any other nondebtor

23  party in interest to assert challenges provided in the Court's

24  final order under 11 U.S.C.," et cetera, "to authorize the

25  debtor to incur indebtedness," et cetera.  So in other words,

37

1    the ability of the stalking horse bidder to bid is subject to

2    the rights of any creditor to object to the validity of that

3    claim within 45 days.  In the eyes of the Court the relief here

4    is ethereal.  Even if the Ableco claim is contested, that

5    process cannot be concluded and the validity of the claim

6    determined prior to the date of the sale.

7          Under the terms of the auction, regardless of outcome

8    of bidding, the rules state that the debtor may adjourn the

9    auction with the consent of Ableco.  Furthermore, if the

10   winning bid -- it should be noted that Ableco is not - by the

11   way of credit bid, and I use Ableco and stalking horse bidder

12   interchangeably here because a stalking horse bidder is credit

13   bidding Ableco's debt.  If the winning bid is insufficient to

14   cover Ableco's debt, then Ableco has the sole discretion to

15   withhold seeking approval of the sale by the Court.  It's found

16   in Docket Number 23-1, the proposed order at page 16.

17         Furthermore, under Section 6.23(3) at page 53, the

18   debtor-in-possession agreement -- an interesting place to have

19   to find it -- Ableco has the right to terminate the sale

20   process within its sole discretion at any time and for any

21   reason or for no reason at all.  Debtor, with the express

22   written consent of Ableco, may modify the bid procedures set

23   out in the order at any time prior to or during the auction

24   without any further notice or Court approval.

25         If you look at the Court's concerns at some of these

38

1    objections, it does seem to the Court that the sale procedures

2    motion was drafted under the premise that there were no other

3    lien holders claiming a lien upon any of the debtor's assets.

4    The credit bid procedures contain no provisions for dealing

5    with any superior claims.  The motion simply states that with

6    respect to any 363(f) issues the debtor will address those at

7    the sale hearing.

8            The Court is not convinced that an approach that

9    basically says "trust me, I'll deal with this later" is the

10   best approach to any Section 363(f) issues.  Given that the

11   proposed sale is a sale in bulk of all of the debtor's assets,

12   these issues are going to exist, whether the sale is to a

13   credit bidder or a cash bidder.  The Court is unsure as to why

14   at least some effort to deal with these issues now is not in

15   order.

16           The Court also finds that the breakup fee is not

17   supported by the evidence presently before the Court.  A 1992

18   decision in the United States Bankruptcy Court for the District

19   of Colorado entitled In the Matter of Twenver, T-W-E-N-V-E-R,

20   Incorporated, 149 Bankruptcy Reporter 954 at page 956, suggest

21   three questions for courts to consider in evaluating breakup

22   fees:  Whether the relationship of the parties who negotiated

23   the fee is marked by self-dealing or manipulation; whether the

24   fee hampers rather than encourages bidding; whether the amount

25   of the fee is reasonable in relation to the proposed purchase

39

1   price.  This court is aware of no case where a breakup fee was

2   awarded to a credit bidder or a creditor of the debtor.  If CME

3   is so closely affiliated with Ableco as to be allowed to credit

4   bid its debt, then it is reasonable to treat it as a creditor

5   for bidding purposes.

6           The record before the Court also does not establish

7   justification for the breakup fee.  It's not related to any

8   actual expenses.  Ableco wants those as well.  There's nothing

9   in the record to indicate that Ableco prepared the data room.

10  That was done by A&M.  The Court does not see how on the record

11  the breakup fee encourages bidding in this case.  There may be

12  other facts that would support the breakup fee but they are not

13  presently before the Court.  The basis for expense

14  reimbursement also seems to be a bit problematic given the fact

15  that none of the fees are subject to anyone's review.

16          It is therefore the ruling of the Court that the

17  motion -- the sale motion and the motion for bidding procedures

18  is denied without prejudice.

19          There are other -- there were other matters on

20  yesterday's docket.  The application for order approving GMP

21  Securities, LP, the motion for order establishing interim

22  compensation and expense reimbursement procedure, the hearing

23  on those motions as well as -- or -- is continued to Wednesday,

24  June 24, 2009, at 1:30 p.m. in Courtroom 2, the Federal

25  Building, 224 South Boulder, Tulsa, Oklahoma.

40

1          With respect to the critical vendor motion, at this
2   point the debtor has no authorization to use cash collateral or
3   financing.   The Court will consider resetting that motion
4   should that financing emerge.
5          I want to at this point advise the parties -- I did
6   advise you yesterday regarding my schedule.   I am out of the
7   office tomorrow and Thursday.   I am available Friday afternoon
8   at 3:00.   I have a committee meeting that day for the
9   Bankruptcy Appellate Panel that will take most of that day.   I
10  anticipate -- I'm fully aware that the effect of this ruling is
11  to send the parties back to the drawing board.   I expect -- I
12  will be surprised if there isn't some sort of financing
13  authority requested on a relatively short basis.
14         If such a request is filed by noon tomorrow, I will
15  see to it that an emergency hearing is set Friday afternoon,
16  and by that I mean Friday, June 12, at 3:00 p.m., here in
17  Tulsa.   If that date is not hit, the next time that I am in the
18  State of Oklahoma is on Friday, June 19th.   The next hearing
19  dates I have after that are June 24th and 25th and, in fact,
20  some of the Mahalo matters have already been set, as I
21  indicated on the 24th.   I simply wanted the parties to be aware
22  of that schedule as they continue their efforts in this matter.
23         This concludes the ruling of the Court.   This hearing
24  is adjourned.   Counsel are excused and the Court will stand in
25  recess.

41

1          Thank you for your time, folks.

2          (Proceedings concluded at 2:57 p.m.)

3                      *  *  *  *  *  *

42

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7                        Ruth Ann Hager

8    Dated:    June 22, 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25